Filed 10/10/22 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO GARCIA,<br><br>    Defendant and Appellant.<br><br>_____<br><br>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES EARL SCOTT,<br><br>    Defendant and Appellant. | A161579<br><br>(Alameda County<br>Super. Ct. No. 617384D)<br><br><br>A161644<br><br>(Alameda County<br>Super. Ct. No. 617384E)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>[NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellant Scott's petition for rehearing is denied. It is ordered that the opinion filed on September 13, 2022, is modified as follows:

> On page 11, a footnote will be added after the sentence that says: "Appellants rely on several cases to support their argument that reversal is warranted." The footnote shall read:

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts: C, D., E., and F.

Scott filed a petition for rehearing pointing out we did not address *People v. Logan* (1899) 123 Cal.414 in our discussion of the four leading cases addressing midtrial continuances. In that case, our high court affirmed the trial court's denial of the defendant's request for a two-month trial continuance due to witness illness after the jury was impaneled. The court held that had the trial court granted the continuance, such an order "would have been reversible error." (Id. at p. 416.) Scott concedes in his petition that the court's comments were arguably dicta. Nevertheless, we find *Logan* readily distinguishable as it did not involve the denial of a motion for mistrial following a *mandatory* continuance based on exceptionally good cause due to an unprecedented pandemic. By contrast, the *Logan* court implicitly found a lack of good cause for the continuance because "Defendant's counsel should have known the condition of their witness before the jury was impaneled, and should have made their showing at that time." (*Ibid.*)

The modification effects no change in the judgment.

Date: _____10/10/2022_____      _____Jackson, P.J._____ P.J.

A161579, A161644 / People v. Garcia & Scott

Trial Court:  Alameda County Superior Court

Trial Judge:  Hon. Mark A. McCannon

Counsel:  Kathy R. Moreno, Solomon Wollack; By Appointment of the First District Court of Appeal under the First District Appellate Project, for Appellants.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, and Bruce M. Slavin, Deputy Attorney General, for Respondent.

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO GARCIA,<br><br>    Defendant and Appellant.<br><br>_____<br><br>THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES EARL SCOTT,<br><br>    Defendant and Appellant. | A161579<br><br>(Alameda County<br>Super. Ct. No. 617384D)<br><br><br>A161644<br><br>(Alameda County<br>Super. Ct. No. 617384E)<br><br>**ORDER MODIFYING OPINION<br>  AND DENYING REHEARING<br>  [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellant Scott's petition for rehearing is denied. It is ordered that the opinion filed on September 13, 2022, is modified as follows:

> On page 11, a footnote will be added after the sentence that says: "Appellants rely on several cases to support their argument that reversal is warranted." The footnote shall read:

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts: C, D., E., and F.

Scott filed a petition for rehearing pointing out we did not address *People v. Logan* (1899) 123 Cal.414 in our discussion of the four leading cases addressing midtrial continuances.  In that case, our high court affirmed the trial court's denial of the defendant's request for a two-month trial continuance due to witness illness after the jury was impaneled.  The court held that had the trial court granted the continuance, such an order "would have been reversible error."  (Id. at p. 416.) Scott concedes in his petition that the court's comments were arguably dicta.  Nevertheless, we find *Logan* readily distinguishable as it did not involve the denial of a motion for mistrial following a *mandatory* continuance based on exceptionally good cause due to an unprecedented pandemic.  By contrast, the *Logan* court implicitly found a lack of good cause for the continuance because "Defendant's counsel should have known the condition of their witness before the jury was impaneled, and should have made their showing at that time."  (*Ibid.*)

The modification effects no change in the judgment.


Date: _____10/10/2022_____          _____Jackson, P.J._____ P.J.

2

A161579, A161644 / People v. Garcia & Scott

Trial Court:  Alameda County Superior Court

Trial Judge:  Hon. Mark A. McCannon

Counsel:  Kathy R. Moreno, Solomon Wollack; By Appointment of the First District Court of Appeal under the First District Appellate Project, for Appellants.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, and Bruce M. Slavin, Deputy Attorney General, for Respondent.

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ALEJANDRO GARCIA,<br><br>     Defendant and Appellant. | A161579<br><br>(Alameda County<br>Super. Ct. No. 617384D) |
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JAMES EARL SCOTT,<br><br>     Defendant and Appellant. | A161644<br><br>(Alameda County<br>Super. Ct. No. 617384E) |

Appellants Alejandro Garcia and James Earl Scott appeal final judgments following a jury trial for murder and kidnapping. Appellants argue that the trial court erred in denying a motion for mistrial made following a mandatory 103-day midtrial delay as a result of court closure orders issued due to public health concerns related to COVID-19. Under the unique circumstances of this case, which include the timing of the

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts: C, D., E., and F.

1

continuance, the relative lack of complexity of the case, and the trial court's communications with and instructions to the jury, we find no error.

Scott further argues that he is entitled to resentencing based on a recent amendment to Penal Code section 654.[1]  Although we agree this amendment applies retroactively, we conclude that amended section 654 does not grant the trial court discretion to essentially "strike" the special circumstance finding and reduce Scott's sentence to anything less than life without the possibility of parole.  As a result, there is no reason to remand Scott's case for resentencing.

In the unpublished portions of this opinion, we address Scott's contentions that his sentence to life without the possibility of parole constitutes cruel and unusual punishment and violates his right to equal protection.  We also address Garcia's arguments that his inability to accept a package plea deal offered to him and Scott violated his right to due process and that the verdict rendered against him was coerced.  We find no error and affirm the judgments.

## I. BACKGROUND

### A. Procedural History

Appellants were charged with the murder and kidnapping of Reynaldo Vazquez.  Scott was also charged with robbery and a special circumstance of felony murder in the course of kidnapping.  (Penal Code, § 190.2, subd. (a)(17)(B).)  Scott was further charged with a special allegation that he personally and intentionally discharged a firearm that caused great bodily injury and death.  Garcia was charged with the commission of an offense in which the principal was armed with a firearm (§ 12022, subd. (a)(1)) and a

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

2

special allegation that he was a major participant in a felony and acted with reckless indifference to human life. (§ 189, subd. (e)(3).)

On January 29, 2020, jury selection began. On March 2, 2020, trial commenced. On July 2, 2020, the jury found Garcia guilty of first degree murder and kidnapping but did not find true the firearm allegation. The jury found Scott guilty of first degree murder, kidnapping, and robbery, and found true the kidnapping special circumstance. It also found true the firearm allegation on the murder and kidnapping counts.

The trial court sentenced Garcia to 25 years to life on the murder count and stayed the sentence on the kidnapping count. The trial court sentenced Scott to statutory life without the possibility of parole on the murder count based on the special circumstance finding. The court sentenced Scott to a middle term of five years on the kidnapping count, with an additional 25 years based on the firearm enhancement and three years based on the great bodily injury enhancement. The court stayed this 33-year-to-life sentence. The court also sentenced Scott to one year on the robbery count, and eight months on the firearm possession count. These sentences were also stayed.

Appellants filed separate appeals. After opening briefs were filed, this court granted the People's unopposed motion to consolidate the two appeals.

B. <u>Factual History</u>

1. *The Shop and The Parties Involved*

The relevant events center around an automobile mechanics shop in East Oakland that was converted to a marijuana grow house. Garcia, Louis Velasco, Carlos Vera, Faustino Becerra, and Armani Miller were all friends or acquaintances who assisted in the marijuana operation at the shop. Garcia and Velasco were close friends who hung out almost every night and slept at the shop. Velasco knew Scott from juvenile hall but did not consider

3

him a friend.  Scott visited the shop occasionally to cut marijuana.  Vera viewed him as an outsider because he was the only African American in a Latino social group.

Vera lived near the shop and became friends with Garcia.  They hung out at Vera's house, the shop, or the park.  Vazquez lived across the street from Vera and was good friends with him.  The two of them hung out on a daily basis.  Miller was also previously good friends with Vazquez, but their friendship deteriorated after Vazquez shorted him on proceeds from a burglary they had committed together.  Miller was then sent to a group home in Iowa and when he returned, he no longer hung out with Vazquez.

Vazquez was known to be in the business of committing robberies and had problems with numerous people, including Garcia.  Vazquez had sold his Mercedes to Garcia in exchange for marijuana.  Issues arose after Vazquez later stole marijuana plants from the Mercedes and then separately confronted Garcia outside of Vera's house as to why Garcia had not changed the registration name on the Mercedes yet.  Vera was present and heard Vazquez say, "I'm going to fuck [Garcia] up."  Vera told Vazquez not to do anything.

### 2. *The Incident at the Park*

About a week prior to the murder, Garcia, Miller, and Becerra were sitting on a park bench smoking marijuana.  A car drove by and shots were fired at them.  No one was hurt, but a bullet passed through Garcia's pants leg.  The group believed that Vazquez was responsible for the shooting.

Garcia, Miller, and Becerra returned to the shop to get guns and then drove off in Garcia's car to find Vazquez.  Miller testified that he was prepared to shoot Vazquez if he found him.  They chased down a car they believed was Vazquez's but saw that Vazquez was not in it.  They then

4

returned to the shop.  The three of them were angry and told Velasco afterwards that they were going to get Vazquez back.

3. *The Kidnapping and Murder*

On the night of the murder, Vera, Miller, and Velasco were hanging out in front of Vera's house while Garcia, Scott, and Becerra were at the shop. Miller saw Vazquez leave his house and said, "Let's get him."  Miller and Velasco ran to the shop and told Garcia, Scott, and Becerra that Vazquez was in the area.  The group then positioned themselves to surround Vazquez after he walked out of a nearby store.  Miller and Becerra approached Vazquez from either side.  Miller and Velasco testified that Scott approached Vazquez from behind with a gun.  Vera was still in front of his house and saw Scott point a gun to the back of Vazquez's head.

The group escorted Vazquez into the shop and closed the door.  Once inside, Scott and Becerra pistol-whipped Vazquez.  Vazquez begged for his life and pleaded with them not to do this because he had a daughter.[2] Garcia, Scott, and Becerra tied Vazquez up with a rope while he was face down on the floor.  Becerra then dragged Vazquez around the shop while he laughed and poured a liquid chemical on his face.

At this point, Garcia told Velasco to get Garcia's car and back it up to the shop's entrance.  The two of them, along with Scott and Becerra then shoved Vazquez into the trunk.  Scott pistol-whipped Vazquez as he tried to prevent the trunk from closing.  Once the trunk was closed, Vera suggested a place they could take Vazquez.  Velasco no longer wanted to participate and

---

[2] During Velasco's testimony of Vazquez begging for his life, one juror became emotional and began to cry.  The trial court took a brief recess.  The court noted to counsel during the recess that the juror started to cry when Velasco "seemed to get emotional about what happened to Mr. Vazquez."

refused to go. Scott or Becerra told him to stay behind to clean up the blood in the shop.

Vera and another friend drove to a dark area in the Oakland Hills in one car while Garcia, Scott, and Becerra followed them in Garcia's car. When they stopped and opened the trunk, Vazquez pleaded with them to let him go, got out of the trunk, and briefly scuffled with Garcia. Scott then pointed a gun to Vazquez's head and backed him into a grassy area about 10 to 15 feet away. Everyone else stayed by the trunk. Vera then heard a gunshot, saw Vazquez drop to the ground, and saw Scott shoot Vazquez twice more in the head. Everyone got back into their cars and left. The following morning, a passing cyclist discovered Vazquez's body.

### 4. *Charges and Pleas*

Appellants, Miller, Vera, and Velasco were charged with murder. They were also initially charged with the special circumstance of murder in the commission of a kidnapping. Miller was additionally charged with the special circumstance of murder in the commission of a robbery. Scott was charged with discharging a firearm that caused great bodily injury and death. Garcia, Miller, Vera, and Velasco were charged with the commission of an offense in which a principal was armed with a firearm.

Soon after jury selection began, Vera, Miller, and Velasco all agreed to plead guilty to second degree murder with the understanding that this would be reduced to voluntary manslaughter if they testified truthfully at trial. The prosecutor offered appellants a package plea deal of 15 years to life for second degree murder. Garcia wanted to accept the offer but Scott did not, and the prosecutor was unwilling to sever these remaining two defendants. Appellants therefore proceeded to trial.

### 5. *Trial, Delay, and Motion for Mistrial*

On March 2, 2020, witness testimony began and lasted for eight days. On March 12, 2020, both parties rested. The jury was scheduled to return on March 17, 2020 to hear closing arguments. On March 16, 2020, the Alameda County Public Health Department issued a shelter-in-place order due to COVID-19. In response, the Alameda County Superior Court sought an emergency order from the California Supreme Court to close its courthouses until April 7, 2020. The March 17, 2020 proceedings were cancelled as a result. On March 23, 2020, Chief Justice Tani Cantil-Sakauye issued an order that suspended all jury trials in California for 60 days. The Chief Justice later extended this suspension by an additional 30 days.

The trial court eventually continued trial to June 8, 2020. On June 5, 2020, Scott moved for a mistrial based on the three-month delay. At the June 9, 2020 hearing on the motion, Garcia orally joined the motion. Scott argued that there was a concern over "the inability of jurors to remember or being able to focus during this pandemic . . . ." The trial court denied the motion based on good cause for the continuance. The court explained that social distancing measures would be put in place and though not ideal, it "cannot have people languishing in custody" while it waits for the pandemic to be over before resuming jury trials.

The trial court held that the risk of lost juror recollection was an insufficient reason to grant a mistrial and stated, "we have notebooks that the jurors were informed that they could take notes for their own recollection. There's also the reporter's transcript in this case that can be read back just in case the jurors missed something. And, as well as their closing arguments, those arguments are there to refresh the recollection of the jurors as to what they heard during the trial." The court further stated that it would conduct

7

voir dire and "inquire as to whether or not the jurors had adhered to their juror obligations during the recess."

Following the hearing, the trial court sent the jurors a letter to inform them that trial would soon resume and to ask that they answer some questions related to their health and continuation of their jury service in light of COVID-19. The trial court noted that it "received positive responses from most of the jurors." Three jurors raised issues with continuing their jury service due to COVID-19 concerns. The court excused these jurors and replaced them with alternates.

### 6. *Deliberations and Verdict*

Trial resumed on June 23, 2020. The trial court re-read CALCRIM No. 101 to the jury, including the admonition not to discuss the case with anyone or to conduct any independent research or investigation during trial. The court did not ask the jurors whether they had followed these obligations during the 103-day recess. The parties did not raise any objections to this lack of questioning. Closing arguments took place on June 23 and 24, 2020. Scott's attorney argued that Scott was being accused of a crime he did not commit and that the prosecution's key witnesses were incentivized to lie about his involvement in order to secure shorter sentences for themselves.

Deliberations began on June 25, 2020. On the first day of deliberations, the jury asked for readback of testimony of two eyewitnesses from the night of the murder, the coroner, and appellants' interviews with the police. On June 29, the jury asked for readback of the testimony of Miller, Velasco, and Vera.

On July 1, 2020, the jury foreperson informed the court that the jury could not all agree to first degree murder as to Garcia and was split 11 to 1. The jury asked the court for the definition of intent and a more elaborate

definition of second degree murder.  The court responded that both definitions were already included in the instructions.  The court asked if the jury all agreed on second degree murder and the foreperson responded no. The foreperson then began to say, "I feel like they…" before the court interjected and said, "If you all agree on murder, fill out the form for the degree of murder which you all agree.  Okay?"  The court directed the jurors to continue deliberating and stated, "if you all still cannot agree, please let me know.  Okay?  And then we will explore other options."

The next afternoon, the jury reached a verdict that found Garcia and Scott guilty of first degree murder and kidnapping.[3]  As to Scott, the jury found true the special circumstance that the murder was committed during the commission of a kidnapping.  The jury also found true the special allegation that Scott intentionally discharged a firearm and caused great bodily injury and death.

## II. **DISCUSSION**

A. Motion for Mistrial

1. *Standard of Review*

The denial of a motion for mistrial is generally reviewed for abuse of discretion.  (*People v. Avila* (2006) 38 Cal.4th 491, 573.)  " 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]'  [Citation.]  A motion for a mistrial should be granted when ' " 'a

---

[3] A new foreperson informed the court that the jury had reached a verdict.  When the court inquired about switching forepersons, the foreperson responded that it was "a group decision."

9

[defendant's] chances of receiving a fair trial have been irreparably damaged.' " ' " (*People v. Collins* (2010) 49 Cal.4th 175, 198–199.) As the moving parties, appellants bore the burden of proof to demonstrate this.

In cases where a defendant's federal constitutional rights to due process and a fair trial are implicated, courts apply the de novo standard of review. (*People v. Albarran* (2007) 149 Cal.App.4th 214, 224, fn. 7.) Under the standard set forth in *Chapman v. California* (1967) 386 U.S. 18, 24, where a constitutional error is found, reversal is required unless the prosecution can show that the error was harmless beyond a reasonable doubt.

Appellants contend that the prejudice resulting from a midtrial continuance constitutes structural error and therefore defies harmless error analysis. Most constitutional errors are trial errors that occur "during the presentation of the case to the jury." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 307–308.) "They are amenable to harmless error review because they can be 'quantitatively assessed in the context of other evidence presented in order to determine whether [their] admission was harmless beyond a reasonable doubt.' [Citation.] 'Structural defects,' on the other hand, 'defy analysis by "harmless-error" standards' [citation] because they are not 'simply an error in the trial process,' but rather an error 'affecting the framework within which the trial proceeds.' " (*People v. Aranda* (2012) 55 Cal.4th 342, 363–364.)[4]

We conclude that the trial court did not err in denying the appellants' motion for mistrial. Consequently, there is no reason for us to quantitatively

_____

[4] Examples of structural errors include the denial of the right to counsel, trial by a biased judge, racial discrimination in grand jury selection, and the denial of the right to a public trial. (*Neder v. U.S.* (1999) 527 U.S. 1, 8.)

10

assess whether a non-existent hypothetical error was harmless beyond a reasonable doubt.

### 2. *Cases Regarding Midtrial Continuances*

Appellants contend that in denying the motion for mistrial, the trial court deprived them of their constitutional right to a fair trial. Appellants rely on several cases to support their argument that reversal is warranted.

The first case is *People v. Dinsmore* (1894) 102 Cal. 381 (*Dinsmore*). There, our high court found that the trial court's order granting a 63-day midtrial continuance due to witness illness constituted an abuse of discretion. (*Id* at pp. 382–383.) The court emphasized the seriousness of the charges made against the defendant as well as the defendant's lack of fault in causing the delay. (*Id.* at p. 383.) The court also considered the risk that the jurors' impartiality was compromised after "roaming at large throughout the county and state for a continuous period of 63 days . . . ." (*Ibid.*) However, the court emphasized that it was not attempting to establish any fixed rule and recognized that "it would be impossible to lay down any fixed rule – by which all cases presenting this question could be determined . . . ." (*Id.* at p. 384.)

In the second case of *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 (*Engleman*), the appellate division of the trial court held that a three-week midtrial continuance to accommodate the trial judge's schedule was inherently prejudicial even though it was difficult to show what effect the delay had on the jury's thought process. (*Id.* at p. 21.) The court highlighted that the delay occurred after the prosecution rested but before the defendant presented his case. (*Ibid.*) The court reasoned that "the jury was left with a one-sided presentation for three weeks" and that "this would cause the jurors to determine the case before hearing both sides." (*Ibid.*)

11

In the third case of *People v. Santamaria* (1991) 229 Cal.App.3d 269 (*Santamaria*), our colleagues in Division Three held that the trial court erred in suspending jury deliberations for 11 days due to the judge's schedule. (*Id.* at pp. 275, 283.) We stated that this unwarranted interruption "came at the most critical period in the trial. The prosecutor and appellant had presented their evidence and argued its significance; the court had instructed on the legal principles to be applied. The case was in the hands of the jury, which had begun its vital task of considering the government's charges against appellant and determining his guilt or innocence of a special circumstances first degree murder." (*Id.* at p. 281.) We held that "at no time is it more essential that the jury should be immunized from such [outside] influences than when it is deliberating on its verdict" and that the trial court "acted to undermine due process requirements by releasing the jurors into the community for 11 days." (*Ibid.*) We noted however, that "[h]ad the adjournment occurred in midtrial, counsels' recapitulation of the evidence during argument might have nullified or minimized the effect of the delay on the jurors' recall." (*Id.* at p. 282.)

Finally, in *U.S. v. Hay* (9th Cir. 1997) 122 F.3d 1233 (*Hay*), to accommodate jurors' vacations, the district court continued trial for 48 days after the presentation of evidence and before closing arguments. (*Id.* at p. 1235.) On review, the Ninth Circuit held that the district court abused its discretion as it has "never approved a jury separation even close to forty-eight days in a criminal case." (*Id.* at p. 1235–1236.) The unprecedented length of delay, coupled with the complex and technical evidence presented to the jury, equated to an inherent lack of due process. (*Id.* at p. 1236.) The Ninth Circuit further noted that the trial court could

12

have still proceeded with trial since the parties stipulated to continuing with only eleven jurors if necessary. (*Id.* at p. 1235.)

By contrast, in *People v. Gray* (2005) 37 Cal.4th 168 (*Gray*), our high court held that a 338-day delay between the guilt and penalty phases of trial did not warrant reversal. The delay was caused by a stay in the proceedings after the defendant filed a writ of mandate. (*Id.* at p. 226.) The court distinguished the facts from those in *Santamaria* and stated that although the delay here was much longer, "it occurred at a natural break in the trial, between the guilt and penalty phases, and not in the middle of deliberations. Moreover, unlike in *Santamaria*, where the trial court lacked good cause for the delay and a viable alternative existed, the trial court here had ample cause for the delay and no alternative: an appellate court had stayed the trial. The trial court had no choice but to obey the stay order." (*Id.* at p. 228.)

Most recently in *People v. Breceda* (2022) 76 Cal.App.5th 71 (*Breceda*), the Fourth District held that the defendant's right to a fair trial was not violated by a 73-day midtrial delay due to COVID-19. (*Id.* at p. 100.) The delay occurred near the end of the prosecution's case-in-chief. (*Id.* at p. 95.) The court found that although the delay was long, several factors weighed against finding a violation. Good cause existed due to the pandemic, the case was not complex such that a delay was detrimental to the jurors' ability to recall evidence, the delay occurred prior to deliberations, and the trial court properly admonished the jurors before and after they returned and confirmed that they obeyed its orders during the recess. (*Ibid.*) The court distinguished both *Engleman* and *Santamaria* on the grounds that the delays there lacked good cause since another judge could have presided over

13

the remainder of trial.  (*Id.* at p. 96.)  No such alternative existed here due to the Chief Justice and presiding judge's orders.  (*Id.* at p. 95.)

### 3. *The Trial Court Did Not Err in Denying the Motion for Mistrial.*

#### i. *Good Cause for the Continuance*

The issue in *Dinsmore, Engleman*, *Santamaria*, and *Hay* was whether the trial court abused its discretion in ordering a midtrial continuance.  In all four cases, the reviewing court explicitly or implicitly found a lack of good cause for the continuance in the first place.  There was therefore less need for the court to rigorously analyze the strength of the defendant's showing of prejudice as balanced against the strength of the good cause for the continuance in order to find an abuse of discretion.  Here, it is undisputed that there was exceptionally good cause for the continuance based on the emergency orders issued due to the pandemic.  Unlike in *Dinsmore, Engleman, Santamaria,* and *Hay*, the trial court had no choice but to continue trial.

At the hearing on the motion for mistrial, the trial court distinguished the facts here from the cases regarding midtrial continuances cited in Scott's moving papers and stated, "This is not a jurors' vacation.  I'm not going off to play golf for a couple of weeks while your client sits in custody.  This is something that was mandatory, that no one expected and we all have to be flexible in this regard."  The trial court was in an extremely difficult position.  It had no choice but to comply with the closure orders issued by the Chief Justice and by Alameda County but was concerned about appellants' right to a fair and speedy trial, as evidenced by its comment that "[w]e just cannot have people languishing in custody . . . ."

14

The pertinent issue then, is not whether the trial court erred in ordering a midtrial continuance, but whether it erred in denying the motion for mistrial following the mandatory continuance. This denial is reviewed for abuse of discretion. Based on the timing of the continuance, the complexity of the case, and the trial court's communications with and instructions to the jury, we find no error.

## ii. Timing of the Continuance

In *Santamaria, supra,* 229 Cal.App.3d 269, our colleagues in Division Three were faced with an 11-day interruption while the jury was deliberating to enable the judge to go on vacation. Unsurprisingly, we concluded that this continuance was improperly granted and lacked good cause. (*Id.* at p. 272.) We then proceeded to analyze whether the defendant was prejudiced by the interruption. Based on the lack of good cause, we concluded that an "11-day continuance granted without established necessity" was not harmless error under any standard. (*Id.* at p. 283.)

In *Engleman, supra*, 116 Cal.App.3d Supp. 14, the three-week continuance to accommodate the judge's schedule occurred after the prosecution rested and before the defense presented its case. The court held that this was prejudicial, as the timing of the continuance left the jurors with a one-sided presentation for weeks, which may have caused them to decide the case before hearing evidence from the defense. (*Id.* at p. 21.)

By contrast, the continuance here occurred after both parties rested. Therefore, the prosecution's evidence was not the last impression left with the jury during the 103-day recess. When the jury returned, counsel had the chance to summarize the evidence and remind the jurors of its theories during closing arguments. The trial court then instructed the jurors before they began their deliberations. Although no midtrial delay is ideal, similar to

15

*Gray*, *supra*, 37 Cal.4th 168, the timing of the delay at least occurred at a natural break during the trial. The trial court recognized this when it denied the motion for mistrial, noting that the parties would have the opportunity to refresh the jury's recollection of the evidence in their closing arguments.

### iii.  Complexity of the Case

Scott argues that this was a serious and complex case in which a lengthy midtrial delay compromised the jury's ability to recall the testimony of the key witnesses in order to make credibility assessments. As the "lone African American in a Latino social group," Scott contends that he was an easy target for the witnesses to all point the finger at as the shooter. Scott's attorney emphasized this point in his closing argument and stated that the prosecution's key witnesses were incentivized to lie in order to receive shorter sentences pursuant to the plea deals they reached with the prosecution.

First, we note that although all murder cases are serious, not all of them are complex such that a midtrial continuance causes equal concern with respect to juror recollection. For example, in *Hay*, *supra*, 122 F.3d 1233, the Ninth Circuit stated that "the jury heard complex, technical evidence against two defendants over a period of nearly four months. The jury could not be expected to adjourn this late in the case for a month and a half without forgetting any of the relevant evidence." (*Id*. at p. 1236.)

In *Breceda*, *supra*, 76 Cal.App.5th 71, the court distinguished *Hay* on this basis and stated that "there was no complex or scientific evidence such that a delay would have been detrimental to jurors' ability to recall specific, complicated evidence." (*Id*. at p. 97.) "Unlike in *Hay*, the case was not complex—Breceda admitted he inflicted the mortal wound and the only issue was whether he did so intentionally or in self-defense." (*Id*. at p. 100.)

Without any evidence of juror misconduct, the court concluded that a 73-day delay alone (especially an unavoidable one) does not establish a due process violation. (*Id.* at pp. 94–95.)

In several respects, this case was even less complex than *Hay* and *Breceda*. Witness testimony did not involve any complex or scientific evidence and lasted for only eight days. And unlike in *Breceda* where the jury had the difficult task of determining what Breceda's state of mind was when he committed the offense, the jury here had to determine who they believed since Scott's defense was that he was not present when the kidnapping and murder occurred while the prosecution's witnesses testified that he was present. Scott's state of mind at the time of the shooting was not at issue.

Second, when denying the motion for mistrial, the trial court reasoned that the jurors' notebooks, the reporter's transcript, and the parties' closing arguments would all serve to refresh the jury's recollection. The jury did in fact, request readback during deliberations of the testimony of five eyewitnesses and appellants' interviews with the police. The jury did not ask for the readback of Miller, Velasco, or Vera's testimony until the third day of deliberations, which suggests that the jury recalled at least some of their testimony from before the recess. At the time of the mistrial motion, there was no evidence that any jurors would have trouble remembering the evidence presented before the recess, and it would have been pure speculation for the trial court to assume so.

Finally, Scott's attorney attacked the credibility of these key witnesses in his closing argument, stating that they were motivated to help the prosecution convict Scott in order to receive shorter sentences for themselves. We presume the jurors were fully aware of this potential bias and took this

17

into account when they assessed the credibility of these witnesses during deliberations. And as the trial court pointed out, the jurors had their notes from before the recess and readback of witness testimony to aid in their recollection and credibility determinations. Just because the jury ultimately found the testimony of the prosecution's witnesses credible does not mean that the trial court erred in denying the motion for mistrial. The trial court acted reasonably in proceeding with trial while ensuring that appellants' due process rights were observed.

### iv. *Instructions and Admonitions Provided to Jury*

As for the risk the jurors were exposed to outside influences during the 103-day recess, the trial court admonished the jurors not to speak with anyone each time the jury adjourned for a break, prior to the continuance.[5] At the hearing on the mistrial motion, the trial court further stated it would send a letter to the jurors. Although the record does not include a copy of the final version of this letter, it does contain a draft version which the court provided to counsel for their input. The draft addressed COVID-related concerns, procedures in place to keep the jurors safe, and invited the jurors to respond with any concerns. Appellants objected to certain phraseology in the draft letter, and the trial court responded that it would make the appropriate changes. Since there is nothing in the record to indicate otherwise, we presume that the trial court updated the letter and sent the final version to the jurors.

This presumption is confirmed by the statement the trial court made to counsel, outside the presence of the jurors, after trial resumed. The trial

---

[5] At the start of trial, counsel stipulated that the jurors may be deemed to have been admonished at each adjournment whether or not the admonition was repeated in full each time.

18

court stated that after sending the letter to the jurors, it "received positive responses from most of the jurors" and that the three jurors who raised COVID-related concerns were removed pursuant to the parties' stipulation and would be replaced with alternates. The trial court then asked whether anyone wished to make a record of anything and all counsel replied, "no." Closing arguments then proceeded. We presume the jurors who did not respond positively were the ones excused by the trial court and that the remaining original jurors did not have any unaddressed concerns that would have impaired their ability to continue trial.

At the mistrial motion, the trial court further stated that when the jurors returned, it would conduct voir dire to see whether they adhered to their obligations during the recess. Scott argues that when trial resumed, the trial court did not follow through in asking the jurors whether they adhered to their obligations during the lengthy recess. Although it is recommended that the trial court inquire about potential juror misconduct following a lengthy recess, no authority supports that the trial court is required to do so.[6] The trial court did re-read CALCRIM No. 101 when trial resumed which included an admonition for the jury not to discuss the case with anyone or to conduct any independent research or investigation.[7] The

---

[6] For example, in *People v. Clark* (2011) 52 Cal.4th 856, our high court held that a failure to explicitly instruct the jury at each adjournment not to view or listen to media coverage of the trial did not violate the defendant's due process rights where the trial court generally advised the jurors not to speak to anyone or express any opinions during trial in accordance with section 1122. (*Id.* at pp. 955–956.)

[7] At oral argument, Scott's counsel asserted that the trial court erred by telling the jurors not to access the internet at all and suggested that this type of order was nearly impossible for jurors to comply with, especially during a pandemic. Even if the court's order may have been overbroad, there is

19

court then asked each juror individually whether he or she would prospectively follow its instructions and each juror responded yes. This is sufficient.

Moreover, despite Scott having made the original request in his motion for mistrial to voir dire the jurors regarding their potential exposure to outside influences during the recess, neither he nor Garcia objected after the trial court re-read CALCRIM 101 or otherwise made a record that they wished the trial court to ask the jurors whether they followed the court's instructions during the recess. As the moving parties, appellants had the burden of establishing that a mistrial was warranted and should have voiced any concerns they had if they wanted to renew their request for a mistrial based on evidence that the jurors were subjected to outside influences. Appellants did not do so and arguably failed to preserve this issue on appeal.[8] (See *People v. Gray*, *supra*, 37 Cal.4th at p. 230.)

---

nothing in the record to indicate that any jurors were unable or unwilling to comply with it.

[8] Of course, "[a] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Strickland v. Washington* (1984) 466 U.S. 668, 689.) Here, trial counsel may have had any number of strategic reasons for not raising an objection. Counsel were present and able to (1) observe the jurors while the trial court questioned them; (2) see first-hand what protocols the court had employed to ensure the safety of jurors; and (3) consider whether it was in their clients' best interests to return to square one and wait in jail until a new trial date could be secured or, instead, to go forward. Counsel may have also concluded for strategic reasons that it was advantageous for the jury to have heard the prosecution's evidence months before in the hopes that the jurors' memories of it would have faded. We will not second-guess counsel's strategic choices and presume they did their best under very trying and unusual circumstances.

20

In any case, in the absence of any contrary evidence, it is presumed that the jury followed the court's instructions during the entirety of trial. (*People v. Stanley* (1995) 10 Cal.4th 764, 837.) "We 'credit jurors with intelligence and common sense' [citation] and presume they generally understand and follow instructions." (*People v. McKinnon* (2011) 52 Cal.4th 610, 670.) Despite the length of the delay, we presume that the jurors followed their obligations and did not discuss the case with anyone or conduct any outside research during the entirety of trial, including all recesses.[9] There is no evidence to the contrary and no jurors raised any such issues in response to the court's letter that was sent before trial resumed. Appellants argue that there is no way of knowing whether any juror was subjected to any outside influences but that the risk of it was great. This argument is based on speculation and appellants have not presented any evidence here or at the trial level to show that any jury misconduct occurred.

Based on the record before us and critically, the timing of the continuance, we do not find any abuse of discretion or error in the trial court's denial of the motion for mistrial. We emphasize however, that this opinion is not intended to provide any fixed rule with respect to midtrial delays due to COVID. As *Dinsmore, supra*, 102 Cal. 381 held, such a fixed rule would be impossible to fashion as the unique facts of each case must govern the court's analysis.

B. <u>Resentencing Under Amended Section 654 as to Scott</u>

Scott was sentenced to life without the possibility of parole on the murder count based on the jury's kidnapping special circumstance finding

---

[9] At oral argument, Scott's counsel was asked whether there was any extensive media coverage of this case. Counsel did not know and could only speculate that there was likely some local coverage.

under section 190.2, subdivision (a)(17).  The court imposed but stayed the sentences on the remaining three counts for kidnapping, robbery, and firearm possession.  In his supplemental brief, Scott contends that he is entitled to resentencing based on a recent amendment to section 654.

Section 654 prohibits multiple punishment for a single act or course of conduct.  (*People v. Delgado* (2017) 2 Cal.5th 544, 570.)  At the time Scott was sentenced, section 654 required that the trial court impose punishment "under the provision that provide[d] for the longest potential term of imprisonment."  (Former § 654, subd. (a).)  Effective January 1, 2022, Assembly Bill No. 518 (2021–2022 Reg. Sess.) amended section 654 to provide the trial court "with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence."  (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

The People concede that this amendment to section 654 applies retroactively but argue it is inapplicable here because Scott was convicted of special circumstance first degree murder and sentenced to the mandatory life without the possibility of parole.  The People contend that amended section 654 does not grant the trial court discretion to essentially strike the special circumstance finding and reduce Scott's sentence to anything less than life without the possibility of parole.  We agree.

Section 1385.1 states, "Notwithstanding Section 1385 *or any other provision of law*, a judge shall not strike or dismiss any special circumstance which is admitted by a plea of guilty or nolo contendere or is found by a jury or court as provided in Sections 190.1 to 190.5, inclusive." (Italics added.)  The trial court therefore has no authority or discretion to strike a special circumstance finding in order to reduce a defendant's punishment.  (*People*

22

*v. Mendoza* (2011) 52 Cal.4th 1056, 1078; *People v. Mora* (1995) 39 Cal.App.4th 607, 614–615.)

Scott argues that staying a sentence of life without the possibility of parole following a special circumstance finding is not the same as striking the special circumstance finding itself. We fail to see a practical distinction. In *People v. Mora, supra,* 39 Cal.App.4th at p. 613 for example, the defendant was convicted of murder with special circumstances, and the trial court reduced the offense to ordinary first degree murder and imposed a term of 25 years to life. On review, the court held that this was improper, as a finding under section 190.2 "provides only two possible punishments, death or life imprisonment without possibility of parole." (*Id.* at pp. 614–615.)

Section 1385.1 was enacted by the voters through Proposition 115, also known as the Crime Victims Justice Reform Act. A stated goal of Proposition 115 was that it would "remed[y] gross inequities and will bring more violent criminals to justice." (Ballot Pamp., Primary Elec. (June 5, 1990) argument in favor of Prop. 115, p. 34.) Courts have interpreted section 1385.1 to remove the trial court's power to modify or reduce a defendant's sentence of life imprisonment without the possibility of parole when a special circumstance finding has been made. (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 298, fn. 17; *People v. Mora, supra,* 39 Cal.App.4th at p. 614–615.)[10]

---

[10] This comports with the rationale that life without the possibility of parole is "reserved for crimes of the most heinous nature" that includes special circumstance murder. (*In re Williams, supra,* 57 Cal.App.5th at p. 436.) "The Legislature rationally judged this crime to be more severe and more deserving of lifetime punishment than nonspecial circumstance first-degree murder." (*Id.*)

Scott's interpretation of amended section 654 would render section 1385.1 pointless, as trial courts could simply ignore a special circumstance finding and impose a lesser term of punishment at sentencing, effectively "striking" the special circumstance finding. Scott's interpretation would also render section 1385.1's inclusion of "notwithstanding any other . . . provisions of law" superfluous. "When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like 'notwithstanding any other law' or 'notwithstanding other provisions of the law." (*In re Greg F.* (2012) 55 Cal.4th 393, 406.) The same holds true for initiative measures by voters, and we can conclude that by including such a phrase, the voters intended for section 1385.1 to prevail over any contrary law, including amended section 654. The judiciary has the duty to guard the voters' initiative power so that it is not undone by improper action or amendment by the Legislature. (*People v. Kelly* (2010) 47 Cal.4th 1008, 1025.)

Our holding also comports with our colleagues in Division Two's recent ruling in *People v. Caparaz* (2022) 80 Cal.App.5th 669. There, we held that the trial court was without discretion to suspend or stay sentencing under amended section 654 because defendant was convicted of a One Strike offense. (*Id.* at p. 690.) The One Strike law under section 667.61, subdivision (h) provides, "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." That this section does not expressly prohibit a "stay" of a sentence or identify section 654 "is not dispositive; it is enough that the provision applies '[n]otwithstanding any other law.'" (*Caparaz, supra,* 80 Cal.App.5th at

24

p. 689.)  We find the same here with respect to section 1385.1.[11]

C.  Cruel and Unusual Punishment as to Scott

Scott next argues that his sentence of life without the possibility of parole constitutes cruel and unusual punishment under the state and federal Constitutions because he was only 22 years old at the time of the murder.  Case authority in this area is well settled, and Scott acknowledges in his brief that his argument has been rejected by a series of California cases.

In *Graham v. Florida* (2010) 560 U.S. 48, 82, the United States Supreme Court held that sentencing a 16-year-old offender to life without the possibility of parole for a nonhomicide offense violated the Eighth Amendment's prohibition against cruel and unusual punishment.  The court stated, "Because '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood,' those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime."  (*Id.* at p. 74–75, quoting *Roper v. Simmons* (2005) 543 U.S. 551, 574.)  The Supreme Court soon extended its holding in *Graham* and held that a juvenile may not be sentenced to mandatory life without the possibility of parole for a homicide offense.  (*Miller v. Alabama* (2012) 567 U.S. 460, 479.)  The court reasoned that juveniles have "diminished culpability and greater prosects of reform" based on their lack of maturity, vulnerability to outside influences, and less formed character compared to an adult.  (*Id.* at p. 471.)

---

[11] Prior to oral argument, Scott's attorney alerted us to Senate Bill No. 300 (2021–2022 Reg. Sess.) which, if passed, would repeal section 1385.1. However, as of August 29, 2022, this bill was ordered to inactive file. Consequently, it does not impact our analysis.

Challenges have since been made to extend this line of reasoning to young adults. In *People v. Argeta* (2012) 210 Cal.App.4th 1478, the defendant was sentenced to life without the possibility of parole for first degree murder. He argued that his sentence constituted cruel and unusual punishment since the crime was committed only five months after he turned 18. The court disagreed, stating that while " '[d]rawing the line at 18 years of age is subject … to the objections always raised against categorical rules … [,it] is the point where society draws the line for many purposes between childhood and adulthood.' [Citations.] Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for the next defendant who is only six months into adulthood." (*Id.* at p. 245–246.)

In *People v. Edwards* (2019) 34 Cal.App.5th 183, our colleagues in Division Four rejected a similar challenge made by defendants who were 19 years old at the time they committed the crimes. Relying on *Argeta*, we confirmed that "a defendant's 18th birthday marks a bright line, and only for crimes committed before that date can he or she take advantage of the *Graham/Caballero* jurisprudence in arguing cruel and unusual punishment. (*Edwards, supra*, 34 Cal.App.5th at p. 190.) We agree with this reasoning and hold that Scott's sentence does not constitute cruel and unusual punishment because he was not a juvenile at the time of the offense.

D. <u>Equal Protection Challenge by Scott</u>

Finally, Scott argues that his right to equal protection under the state and federal Constitutions was violated because he is ineligible for a youth offender parole hearing under section 3051 while two other similarly situated groups are eligible. Our review of an equal protection challenge is

26

de novo.  (*California Grocers Assn. v. City of Los Angeles* (2011) 52 Cal.4th 177, 208.)

Under section 3051, juveniles who are sentenced to life without the possibility of parole are eligible for a youth offender parole hearing after 25 years of incarceration.  (§ 3051, subd. (b)(4).)  Likewise, young adults between the ages of 18 and 25 who are sentenced to 25 years to life are also eligible for a youth offender parole hearing after 25 years.  (§ 3051, subd. (b)(3).)  Young adults sentenced to life without the possibility of parole like Scott however, are ineligible for a youth offender parole hearing.

1.  *Similarly Situated Groups*

"The constitutional guaranty of equal protection of the laws means simply that persons similarly situated with respect to the purpose of the law must be similarly treated under the law.  [Citations.]  If persons are not similarly situated for purposes of the law, an equal protection claim fails at the threshold.  [Citation.]  The question is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.' " (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155.)

We find that for purposes of section 3051, young adults sentenced to life without the possibility of parole are similarly situated to those sentenced to 25 years to life as well as juveniles sentenced to life without the possibility of parole.  "[T]he purpose of section 3051 is not to measure the extent of punishment warranted by the offense the individual committed but to permit the evaluation of whether, after years of growth in prison, that person has attained the maturity to lead a law-abiding life outside of prison."  (*In re Jones* (2019) 42 Cal.App.5th 477, 485–486 (conc. opn. of Pollak, J.).)  These three groups are therefore similarly situated "for the purpose of evaluating

whether they have outgrown the youthful impulses that led to the commission of their offenses." (*Ibid.*)

## 2. *Rational Basis for Disparate Treatment*

"Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference. [Citation.] "[E]qual protection of the law is denied only where there is no 'rational relationship between the disparity of treatment and some legitimate governmental purpose.'" (*People v. Edwards*, *supra*, 34 Cal.App.5th at p. 195.) This standard is exceedingly deferential. "We must accept any plausible rational basis without questioning its wisdom, logic, persuasiveness, or fairness, and regardless of whether the Legislature ever articulated it." (*People v. Sands* (2021) 70 Cal.App.5th 193, 204.)

We find there is a rational basis for the disparate treatment of young adults sentenced to life without the possibility of parole. First, as between young adults (between the ages of 18 and 25) and juveniles (below the age of 18) sentenced to life without the possibility of parole, our colleagues in Division Four followed the precedent of the United States Supreme Court and held that the age line drawn by the Legislature between juveniles and adults is a rational one to justify disparate treatment. (*People v. Morales* (2021) 67 Cal.App.5th 326, 347; *In re Murray* (2021) 68 Cal.App.5th 456, 463–464.) Our own Division also concluded the same in *People v. Sands*, *supra*, 70 Cal.App.5th at p. 204. We follow this line of reasoning and reject Scott's contention that these cases were wrongly decided.

Second, as we held in both *People v. Morales*, *supra*, 67 Cal.App.5th at p. 348 and *People v. Sands*, *supra*, 70 Cal.App.5th at p. 204, the severity of the crime provides a rational basis for disparate treatment between young

28

adults sentenced to life without the possibility of parole and those sentenced to a lesser term like 25 years to life. Special circumstance murder "carries a mandatory sentence of [life without the possibility of parole] or death (§ 190.2, subd. (a)), which are the harshest penalties available under our penal system and are reserved for crimes of the most heinous nature." (*In re Williams* (2020) 57 Cal.App.5th 427, 436.) "In excluding [such offenders] from youth offender parole hearings, the Legislature reasonably could have decided that youthful offenders who have committed such crimes—even with diminished culpability and increased potential for rehabilitation—are nonetheless still sufficiently culpable and sufficiently dangerous to justify lifetime incarceration." (*Ibid*.)

We acknowledge that a number of Court of Appeal justices, including from this court, have called for legislative reconsideration of section 3051 to include young adults sentenced to life without the possibility of parole. (*In re Murray*, *supra*, 68 Cal.App.5th at p. 464.) However, our high court reminds us that "[e]qual protection analysis does not entitle the judiciary to second-guess the wisdom, fairness, or logic of the law." (*People v. Turnage* (2012) 55 Cal.4th 62, 74.)

E. Package-Deal Plea Bargain as to Garcia

Garcia contends that the package-deal plea bargain offered to him and to Scott violated his right to due process because he was prevented from accepting the offer after Scott rejected it. We disagree.

"It has long been established that guilty pleas obtained through 'coercion, terror, inducements, subtle or blatant threats' are involuntarily and violative of due process. [Citation.]" (*In re Ibarra* (1983) 34 Cal.3d 277, 287, disapproved on another ground in *People v. Mosby* (2004) 33 Cal.4th 353, 360–361.) Coercion is of special concern in the context of package-deal

29

plea bargains, as a defendant may fear harm or retaliation by his codefendant if he does not plead guilty. Therefore, "special scrutiny must be employed to ensure a voluntary plea." (*Id*. at p. 287.)

Package-deal pleas however, are not by themselves coercive per se and must be analyzed based on the totality of the circumstances. (*In re Ibarra, supra,* 34 Cal.3d at p. 286.) Our high court has recognized them as "a *valuable tool* to the prosecutor, who has a need for *all* defendants, or none, to plead guilty. The prosecutor may be properly interested in avoiding time, delay, and expense of trial of all the defendants. He [or she] is also placed in a difficult position should one defendant plead and another go to trial, because the defendant who pleads may become an adverse witness on behalf of his codefendant, free of jeopardy." (*Id*. at p. 289, fn. 5.)

In *Liang v. Superior Court* (2002) 100 Cal.App.4th 1047, the court held that where Liang's co-defendants accepted but then withdrew their guilty pleas in the context of a package-deal plea, Liang's guilty plea was also properly voided. (*Id*. at p. 1059.) The court stated, "Liang is trying to receive the benefits of his bargain when an express reciprocal condition was voided. Moreover, Liang has not been deprived of any right to receive the indicated sentence. He only had that right if all three defendants agreed to plead guilty." (*Id*. at p. 1056–1058.)

Here, the prosecutor had the discretion to offer a package-deal plea to Garcia and Scott. As they were the only two defendants left at this point, the prosecutor had a legitimate interest to condition the plea deal on both parties' acceptance, to avoid the time and expense of trial. Garcia argues that by conditioning his acceptance of the plea deal on Scott's, the prosecutor gave Scott coercive power over Garcia to not accept the plea deal and proceed

30

to a joint trial so that Scott could deflect the blame.  Garcia concedes he has no case authorities to support this novel argument.

The package-deal plea offered by the prosecution was expressly conditioned on both Garcia and Scott's acceptance of it.  This was properly within the prosecutor's discretion to offer.  Garcia did not have an independent right to the reduced sentencing offered in this plea deal, absent both their acceptance.  Like any defendant, Scott had the right to refuse the deal and proceed to a jury trial.  His exercise of this right did not equate to exercising coercion over Garcia like in the case where a co-defendant coerces or threatens a defendant to accept a plea deal.

Nor did Garcia's inability to accept the plea deal implicate a waiver of any constitutional rights, which is the primary concern when a defendant is coerced into accepting a plea deal.  The rights that are waived include "the privilege against self-incrimination, the right to trial by jury, and the right to confront his accusers." (*In re Ibarra, supra*, 34 Cal.3d at p. 284.)  By not accepting the package-deal plea, Garcia and Scott proceeded to a jury trial without waiving any of their rights.

F.  Coerced Jury Verdict as to Garcia

Garcia next argues that he was denied the right to a fair trial as the trial court coerced the jury to return a verdict after the jury informed the court, on the fourth day of deliberations, that it was split 11 to 1 as to convicting Garcia of first degree murder.  We are not persuaded.

"Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that

31

the jury can agree." (§ 1140.) "The determination whether there is reasonable probability of agreement rests in the sound discretion of the trial court. [Citation.] The court must exercise its power, however, without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' " (*People v. Rodriguez* (1986) 42 Cal.3d 730, 775.)

It is not necessarily coercive for a trial court to ask the jury to continue deliberating after learning that the vote is split 11 to 1. The court may do so "where, in the exercise of its discretion, it finds a 'reasonable probability' of agreement." (*People v. Pride* (1992) 3 Cal.4th 195, 265.) Any claim of coercion depends on the specific circumstances of the case. (*Id*.) For example, there was no coercion found where the trial court did not make any coercive remarks to pressure the minority juror, nor any remarks "urging that a verdict be reached or indicating possible reprisals for failure to reach agreement." (*People v. Sheldon* (1989) 48 Cal.3d 935, 960.)

Here, the trial court did not make any remarks to pressure the minority juror to change his or her vote, nor make any remarks that there would be a negative consequence if the jury failed to reach an agreement. After the jury informed the court that it was split 11 to 1 as to first degree murder, it asked the court for the definition of intent and a more elaborate definition of second degree murder. The court responded that both definitions were already included in the instructions. When the jury foreperson began to say, "I feel like they…" to potentially share more details of the deliberations, the court properly interjected and informed her that the jurors should continue deliberating and then "fill out the form for the degree of murder which you all agree." The court also told the foreperson to let the court know if the jury could still not agree after further deliberations. The

32

next day, the jury reached a verdict without raising any further issues to the court.

The trial court did not abuse its discretion in directing the jury to continue deliberating after the jury voluntarily informed the court that it was split 11 to 1 as to first degree murder. Under these circumstances, the court properly found that there was a reasonable probability of an agreement. (§ 1140.) Contrary to Garcia's argument, the trial court did not "repeatedly [tell] the jurors to return with a verdict they all agreed upon" but did so only once and also told the foreperson to let the court know if further deliberations proved unsuccessful. The jury raised no further issues and reached a verdict the following day. The court did not make any coercive statements that a verdict must be reached.

Finally, we do not find Garcia's reliance on *Smalls v. Batista* (2d Cir. 1999) 191 F.3d 272 apposite. There, the court held that the trial court placed a " 'novel burden' " on the jurors to convince one another of their views after learning of a 11 to 1 split. The court held that based on this, the trial court was also required to provide cautionary language that the jurors should not surrender their own conscientiously held beliefs. (*Id.* at pp. 280–281.) The trial court placed no such " 'novel burden' " on the jurors here.

### III.  <u>DISPOSITION</u>

The judgments are affirmed.

33

_____

                                        WISEMAN, J.*

We concur.


_____

JACKSON, P. J.



_____

BURNS, J.








*People v. Garcia & Scott* / A161579, A161644

* Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A161579, A161644 / People v. Garcia & Scott

Trial Court:  Alameda County Superior Court

Trial Judge:  Hon. Mark A. McCannon

Counsel:  Kathy R. Moreno, Solomon Wollack; By Appointment of the First District Court of Appeal under the First District Appellate Project, for Appellants.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, and Bruce M. Slavin, Deputy Attorney General, for Respondent.